NEW YORK LIFE INS. CO. *v.* NESSOSSIS.

(In Banc. June 10, 1940. Suggestion of Error Overruled October 28, 1940.)

[196 So. 766. No. 33802.]

Watkins & Eager, of Jackson, and Louis H. Cooke, of New York City, for appellant.

416

420

Alexander & Satterfield, of Jackson, for appellee.

Argued orally by **W. H. Watkins, Sr.**, for appellant, and by **James Alexander** and **J. C. Satterfield**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

The determinative point in this case revolves around the provisions of the policy which introduce the so-called surrender charge, a question which has, been examined and re-examined by this Court in New York Life Ins. Co. v. Blaylock, 144 Miss. 541, 110 So. 432; Lamar Life Ins. Co. v. Minor, 170 Miss. 223, 154 So. 542; New York Life Ins. Co. v. Boling, 177 Miss. 172, 169 So. 882, 111 A. L. R. 967; and Mutual Life Ins. Co. v. Nelson, 184 Miss. 632, 184 So. 636, 186 So. 837. Appellant admits in its briefs that the policy provisions in the present case are identical with those in the Boling case, from which it follows that the decree here must be affirmed unless (1) we overrule the Boling case, or (2) distinguish or qualify it, because of the parol evidence in the present case, which we shall later mention.

It is not to be denied that there has been ample ground for differences in opinion upon the correctness of the decisions in the cited cases. The dissenting opinion in the Boling case discloses it as well as the dissent delivered along with the present opinion. But in the Boling case we called attention to the consideration that decisions on such a question should not be overruled because of the thousands of insurance policies written in this State since the publication of the decisions; for in such a situation it is the settled rule that prior decisions will not be overruled unless manifestly and undoubtedly wrong, and mischievous in operation and effect. Forest Product & Mfg. Co. v. Buckley, 107 Miss. 897, 899, 66 So. 279; Childress v. State (Miss.), 195 So. 583. All that we are called on to say now as to the questioned decisions may be summarized by stating, as we do, that in our judgment

they are neither manifestly or undoubtedly wrong, nor are they mischievous in operation or effect.

In Mutual Life Ins. Co. v. Nelson, supra [184 Miss. 632, 184 So. 639], there was pointed out the distinction between the provisions of the policy in that case wherein "the figures contained in the table [the table of surrender and loan values] represent the actual amounts available after deduction of the surrender charge," and those of the policy in the Boling case, which are the same as the case now before us, wherein the figures contained in the table are of "guaranteed cash surrender values," and which, as to the latter, we said in Lamar Life Ins. Co. v. Minor, supra, was not a fixation of definite and final figures, but was only a stipulation of minimum amounts.

It is insisted now, however, that because there is evidence in this case given by insurance experts, that in the insurance parlance of the inner circle of that business the terms "cash value" and "guaranteed cash surrender value" are understood to mean the same thing, we should hold that the present case comes under, and should end in the same result as in, the Nelson case. Appellee replies that there was evidence to the same effect in the Boling case as in the present case. But if the simple words "cash value," easily understood, mean the same thing as "guaranteed cash surrender value," why were the two extra words used in the language last quoted? The evident answer must be that it was because some favorable additional meaning was intended to be found by policy purchasers in, or to be understood by them because of, those additional words; and we have stated in the Minor and Nelson cases what that meaning is, as read by those who are not required to be specially versed in the insurance field. In construing insurance policies every word or phrase must be given meaning and effect if reasonably possible, and especially so when favorable to the insured —a rule which must be thrown overboard, as it seems to us, before it can be said that "cash value" and the phrase,

with two additional words, ''guaranteed cash surrender value'' mean precisely the same.

The state of the law, as found in a careful examination of the many authorities dealing with the subject of the availability of parol evidence to explain the meaning, according to trade or business usage of particular terms or expressions in a contract, said to be capable of more than one meaning, may be summarized approximately as follows: When the parties to a contract are engaged in the same business or trade they are presumed to have knowledge of the trade significations of the terms employed in contracts appertaining to that business, and as between such parties the significations aforesaid may be shown by parol; but, as to those not affiliated with or engaged in such trade or business, the terms must be construed in their ordinary and popular sense in the light of all the surrounding factual circumstances, unless it be shown by proof that the opposite party had actual knowledge of the trade or business interpretation of the terms employed, or unless such terms, although of a special business or trade, were in such common use throughout the community and were so generally understood therein as having the meaning ascribed to them by the trade or business that knowledge thereof is to be fairly imputed to the party, and that he contracted in reference to it. See, for instance, the review of the subject in 4 Jones Com. Ev., Sections 1571-1595. Also 1 A. L. I. Restatement, Contracts, secs. 247, 248.

The proof here does not bring the case within a situation where, as against the insured, the terms in question shall be required to submit to a construction other than that supplied by the words when considered in their ordinary sense, which is to say, in the sense in which they would most likely have been popularly understood—and that interpretation we have given in the Minor and Nelson cases, as already mentioned.

The statute, Section 5171, Code 1930, definitely discloses the policy of the law of this State in the matter of

the contents of insurance contracts. It requires that the terms of contracts of insurance shall be plainly expressed; and while it cannot be expected that all terms which might be denominated as technical shall be eliminated, nevertheless it can be expected and required that when through experience it has been learned that any particular joinder of words or phrases has caused repeated misunderstanding and litigation, these words or phrases shall be discontinued and those of a plainer meaning inserted in lieu thereof. There is no such a dearth in our language that this may not be done. The money which purchases and maintains life insurance is generally hard earned, and is often out of meager incomes. Who is insured, for how much for how long should be made as plain and certain as within human capacity, so that the insured shall have insurance and not lawsuits.

We therefore repeat, as applicable here, what was said in Columbian Mut. Life Ins. Co. v. Craft (Miss.), 185 So. 225, 227, as follows: "As respects a feature wherein there is no practical difficulty in making the language plain and free from doubt, we are in accord with the remark found in Turner v. Fidelity, etc., Co., 112 Mich. 425, 70 N. W. 898, 38 L. R. A. 529, 67 Am. St. Rep. 428, that a policy or certificate of insurance 'should be framed with such deliberate care that no form or expression by which, on the one hand, the party assured can be caught, or by which, on the other, the company can be cheated, should be found on the face of it;' (page 899) and the only effective way to foster that result is to construe any doubtful provision against the company . . . which prepared and put forth the policy."

The conclusion is that we decline to overrule any of the cases herein cited, and we decline to distinguish or qualify the Boling case.

Affirmed.

McGehee, J., delivered a dissenting opinion.

The bill of complaint herein alleges that on January 20, 1930, the appellant New York Life Insurance Company issued to Chapman C. Sutton a life insurance policy effective January 30, 1930, wherein it agreed to pay to Mrs. Mary E. A. Sutton, his wife, the sum of $2,000, provided the policy was kept in force by the payment of premiums; that the premiums were paid until the quarterly premium became due July 30, 1934; that the insured died on May 24, 1935, and that by reason of the full reserve value which had accrued under the policy, and was available to the insured for the purchase of extended insurance at the time of the lapse thereof for failure to pay the quarterly premium due July 30, 1934, the same was in full force and effect at the time of the death of the insured. However, under the plain provisions of the contract of insurance the full reserve was not to go to the purchase of extended insurance in the event of lapse between the third and ninth years. On the contrary, it is expressly agreed in the policy that only the cash surrender value, which is designated therein as the full reserve less a surrender charge of not more than $1\frac{1}{2}\%$ of the face of the policy, should be available for that purpose. The exact amount of the surrender charge to be made, within the limitation above mentioned, had been deducted from the reserve in advance, and the net result of such deduction from the reserve was reflected in the table of guaranteed loan and surrender values set forth in the policy as cash surrender value, paid up insurance, and extended insurance; and the policy so states. The table referred to gives the amount of the cash surrender value and paid-up insurance, respectively, in definite sums of money, and also the amount of extended insurance in years and days, and a clause in the policy recites that the values set forth in the table are computed in accordance with the provision authorizing the surrender charge, and which had been deducted in advance of the issuance and delivery of the policy.

The extended insurance contracted for expired prior to the death of the insured, due to the fact that the cash surrender value, after deducting a loan of $146 which was admittedly due on the policy, was not sufficient to purchase extended insurance up to the date of his death. The recovery by the beneficiary is upheld by the majority opinion in the instant case by applying the full reserve to the purchase of extended insurance contrary to the express provisions of the policy, the decision being based on the ground that the provision for deducting from the reserve a surrender charge of not more than $1\frac{1}{2}\%$ of the face of the policy is unenforceable for uncertainty, and void as being in violation of section 5171 of the Code of 1930, which forbids discrimination between policy-holders and requires the terms of an insurance contract to be plainly expressed. I could concur in this view if the amount of such surrender charge had been left to the future determination of the insurer at the time of the issuance of the policy, instead of having been deducted in advance so as to advise the insured as to the exact amount of his cash surrender value, paid-up insurance, and extended insurance, after the deduction of the surrender charge had been made. The identical provision as to a deduction of the surrender charge of not more than $1\frac{1}{2}\%$ was upheld as being in compliance with said section 5171 of the Code, supra, where the charge had been deducted in advance, as here, in the case of Mutual Life Insurance Co. v. Nelson, 184 Miss. 632, 184 So. 636, 186 So. 837, wherein the Court drew a distinction between "cash value" in the table in that policy, and "guaranteed cash surrender value" in the policy which was before the Court in the case of New York Life Ins. Co. v. Boling, 177 Miss. 172, 169 So. 882, 111 A. L. R. 967, and held that "guaranteed" means a mere minimum value, instead of fixed value—a distinction unknown to the life insurance business and to the text writers on the subject of insurance, as will be hereafter shown. The Nelson case followed the decision announced on that point in Lamar

Life Ins. Co. v. Minor, 170 Miss. 223, 154 So. 542, which is unsupported by any previous decisions and has been cited only by the Supreme Court of Alabama in the case of Carter v. Mutual Ben. Life Ins. Co., 230 Ala. 389, 161 So. 446. The policy involved in the Nelson case itself used the terms "cash value" and "cash surrender value" interchangeably, showing that they were understood to mean the same thing, and the proof in the case at bar, which was elicited by the appellee in response to the interrogatories propounded to appellant, and which was introduced in evidence, shows without dispute that these two terms, as well as "guaranteed cash surrender value" are always used interchangeably in contracts in the life insurance business; and no text writer is quoted, nor decision cited by counsel from any other jurisdiction, either sustaining the distinction made in the Minor case, or intimating that such distinction of terms had ever been elsewhere contended for. The distinction was merely assumed in the Minor case, in the absence of proof as to technical meaning of "cash value," "cash surrender value," and "guaranteed cash surrender value," showing that they were synonymous terms.

Certain interrogatories were attached as an exhibit to the bill of complaint, requiring the insurance company to furnish, among other data, information under oath as to the amount of the reserve on the policy at the time of the lapse thereof for nonpayment of the quarterly premium aforesaid, and as to what surrender charge had been set up by the company against the same for each year from the third to the ninth year, inclusive, and also the amount of the surrender charge actually deducted from such reserve in determining the period of extended or temporary insurance on account of the policy having lapsed for nonpayment of the quarterly premium due July 30, 1934.

The insurance company filed its answer accordingly, and stated therein, as well as in its answers to the interrogatories, that the amount of the reserve under the pol-

icy after it lapsed at the end of the said four and one-half year period was the sum of $174, as alleged by the beneficiary in her bill of complaint, computed on the basis of the American Experience Table of Mortality and interest at 3% per annum, as provided in the policy contract; that a surrender charge of $11.50 per $1,000, or a total of $23, had been deducted from the reserve, which was less than the maximum charge of 1½% contracted for, representing the difference between the said reserve and the cash surrender value of the policy at the time of the lapse thereof; that such surrender charge is shown by the terms and provisions of the policy itself to have been deducted from the reserve as aforesaid at the time of the issuance of said policy, and so as to leave the cash surrender value shown to be specified therein for each year, from the third to the ninth, as set forth in the "Table of Guaranteed Loan and Surrender Values" in the face of the policy. Moreover, it is clearly shown in said table that such cash surrender value at the end of four years is $64 per $1,000 of the face amount, and at the end of the fifth year $87 per $1,000 thereof, and the policy having lapsed at the end of four and a half years, the cash surrender value, by interpolation into the table contained in the policy, quite obviously would be $75.50 per $1,000, or the sum of $151, and which when deducted from the reserve of $174, computed as hereinbefore stated, and as stipulated for in the policy, left the $23 surrender charge in question.

It may be conceded for the purpose of this decision that the only issue in the case, as contended by the appellee, is whether or not the appellant insurance company has plainly provided in the policy contract and application for the right to deduct the surrender charge therein referred to. No complaint is made that the reserve on the policy at the end of any year after the policy shall have been in force for as many as three years cannot be readily and easily ascertained, nor can it be successfully contended that the cash surrender value is not specifically

stated in the "Table of Guaranteed Loan and Surrender Values." The policy states, as will be observed from the provisions thereof hereinafter quoted, that the cash surrender value shall be the reserve on the face of the policy, less a surrender charge for the third to the ninth year, inclusive, of not more than 1½% of the face of the policy. The sole question then presented to the court below, and which now confronts us, is whether or not in view of the fact that the reserve is readily and easily ascertainable, when computed as expressly provided for in the policy, and the cash surrender value for each year was set forth in advance in precise figures in the policy as given in the table of values, it can be said that the amount of the surrender charge is left in doubt, or is not plainly expressed, as required by section 5171 of the Code of 1930.

The interrogatories filed with the bill of complaint required of the insurance company to state under oath, not only the amount of the surrender charge set up each year against the reserve from the third to the ninth, inclusive, as aforesaid, but the amount of extended insurance available on the date of lapse to continue the policy in force (which was already given in the table of values contained in the policy), and also the method by which the company arrived at the period of extended insurance, thus rendering competent the testimony wherein responsive to the interrogatories (if indeed such testimony had been needed to explain the "Table of Guaranteed Loan and Surrender Values" hereinafter set forth), that the surrender charge had been fixed on a graduated scale beginning at $15 per $1,000 for the third year, and diminishing annually to $2.50 for the ninth year, and had been deducted when the policy was issued, leaving the cash surrender values, paid-up insurance, and the periods of extended insurance for each year as stated in the table of values set forth in the policy; and that the method of thus arriving at such values in the light of such surrender charges was that adopted by the Office Committee of the company in 1907,

and uniformly applied without any discrimination to all similar contracts. Moreover, the policy itself expressly states, as hereinafter shown, that "the values in the 'Table of Guaranteed Loan and Surrender Values' are computed in accordance with the above provisions," having reference to the fact that the cash surrender value stated in the table is the reserve less the surrender charge deducted for each of said years, and to the fact that the reserve is computed, as provided for in the policy, on the basis of the American Experience Table of Mortality, and interest at 3%. And, of course, in applying such cash surrender value to the purchase of "temporary" or extended insurance the insurer would be entitled to deduct therefrom any indebtedness due as the result of the loan.

Also, it is to be noted that section 5171 of the Code, supra, does not require that the terms of an insurance policy shall be so written as to be readily and easily understood by all policy holders, whether familiar with the meaning of certain technical terms peculiar to life insurance contracts or not, but only requires that the terms and conditions of such contracts shall be "plainly expressed." Indeed, it would be difficult, if not impossible, for any insurer to comply with the requirement first above suggested, in enlargement of the statute, and continue to afford the protection now being enjoyed by untold thousands of policy-holders other than insurance men, and who are, of course, unfamiliar with such terms as "reserve computed according to the American Table of Mortality and interest at 3%," "participating paid-up insurance," "cash surrender value," "net single premium," etc. Such a requirement would necessitate the abandonment of the use of all technical terms, peculiar to the life insurance business; or the adoption of the alternative, followed in the instant case, of setting forth in a table of values the precise results of the computations made in advance in the application of the technical terms so employed.

The pertinent provisions of the policy are quoted below in the order in which they appear, as follows:

"Guaranteed Loan and Surrender Values

"*Loans.*—After three full years premiums have been paid and before default in the payment of premium, the Company, upon receipt of this Policy and a Loan Agreement satisfactory to the Company, will advance to the insured on the sole security of this Policy any amount which, with interest, shall be within the limit of the Cash Surrender Value of this Policy (Here appear the stipulations as to the 6% rate of interest, etc., and as to how the loan may be repaid).

"*Surrender Values.*—In event of default in payment of premiums after three full years' premiums have been paid, the following benefits shall apply:

"(a) *Temporary Insurance.*—Insurance for the face of the Policy . . . less the amount of any indebtedness hereon, shall, upon expiry of the period of grace, be continued automatically as Temporary Insurance as from the date of default for such term as the Cash Surrender Value less any indebtedness hereon will purchase as a net single premium at the attained age of the Insured, according to the American experience table of mortality and interest at 3 per cent. . . .

"(b) *Participating Paid-Up Insurance.*—Within three months after such default, but not later, the Insured may surrender this Policy and elect in place of such Temporary Insurance to have this policy endorsed for the amount of Participating Paid-up Insurance which the Cash Surrender Value at date of default less any indebtedness hereon will purchase as a net single premium at the attained age of the Insured at the date of default according to the American experience table of mortality and interest at 3 per cent. . . .

"(c) *Cash Surrender Value.*—If the Policy shall not have been indorsed for Participating Paid-up Insurance, the Insured within three months after such default, may surrender this Policy and all claims thereunder and re-

ceive its Cash Surrender Value as at date of default less any indebtedness hereon. The Cash Surrender Value shall be the reserve on the face amount of the policy at date of default, omitting fractions of a dollar per thousand of insurance, . . . and less a surrender charge for the third to the ninth years, inclusive, of not more than one and one-half per cent of the face of the policy. The reserve shall be computed on the basis of the American experience table of mortality and interest at 3 per cent.

"*Cash Surrender Value of Fully Paid Policy.*—If this Policy shall have become fully paid by its terms, the Insured may surrender the Policy and all claims thereunder within one month after any anniversary of the policy and receive its cash surrender value less any indebtedness hereon. Such cash surrender value shall be computed on the basis described under (c) above.

"Table of Guaranteed Loan and Surrender Values

| After Policy has been in force | Cash surrender Value or Loan Value for each $1,000 of face amount. | Paid-up Insurance for each $1,000 of face amount. | Temporary Ins. from date of default. | |
|---|---|---|---|---|
| | | | Years | Days |
| 3 | $ 46 | $122 | 6 | 29 |
| 4 | 64 | 167 | 8 | 231 |
| 5 | 87 | 223 | 12 | 8 |
| 6 | 109 | 274 | 15 | 38 |
| 7 | 133 | 330 | 18 | 162 |
| 8 | 159 | 387 | 21 | 156 |
| 9 | 185 | 443 | 23 | 362 |
| 10 | 213 | 499 | 26 | 62 |
| * * * * | | | | |

"The values in the 'Table of Guaranteed Loan and Surrender Values' are computed in accordance with the above provisions, on the basis of $1,000 of face amount, assuming that premiums have been duly paid for the number of years stated, that there is no indebtedness to the Company, that there are no outstanding dividend additions nor dividend deposits, *and after deduction of the surrender charge*, if any." (Italics mine.)

It will be observed that in order to obtain "paid-up" insurance under option (b) a physical surrender of the policy contract to the company for endorsement is contemplated; that this is likewise true if the insured should desire to exercise option (c) and take the cash surrender value, at any time after three full years' premiums have been paid, or when the policy shall have been fully paid up at the end of twenty years; but that when neither option (b) nor option (c) is exercised, as was true in the case at bar, then the temporary or extended insurance provided for under clause (a) is automatically continued for the number of years and days specified in the foregoing "Table of Guaranteed Loan and Surrender Values," above set out, without requirement of affirmative action on the part of the insured. Then, too, the bill of complaint in this case alleges that the original of the policy herein sued on has been lost, wherefore no physical surrender could reasonably be required as a condition precedent to the exercise of either of the options provided for. Nevertheless, the surrender charge is deductible under clause (a) the same as under (b) and (c), for the reason that the insurer has not in either instance contracted to pay the insured the full reserve where the policy is allowed to lapse at any time from the third to the ninth year, inclusive. Since clause (a) provides that the insured is entitled to such "temporary" or extended insurance as the cash surrender value will purchase, and it is stipulated under clause (c) that the cash surrender value shall be the reserve less the surrender charge, it necessarily follows that such charge is to be deducted in determining the amount of the protection that is to be given under said clause (a) of the policy. The several options being the mathematical equivalent of each other, the question suggests itself as to whether the insurer could deduct a surrender charge under options (b) and (c) and not do so under clause (a) without violating the provisions of section 5171 of the Code of 1930, supra, against discrimination between policy hold-

ers having equal rights; and this is especially true where the record discloses that the surrender charge is not made merely because of the work incident to handling book entries in connection with a physical surrender and cancellation of the policy and election to take the paid-up insurance under option (b) or the cash surrender under option (c), but is deducted chiefly for the purpose of repaying acquisition expenses where the policy has not been in force for sufficient time to more than pay its own way; to discourage the lapsing of policies during the early years after they are written; and to prevent the practice of "twisting" of the insurance from one company to another in the interest of an agent, and to the detriment of the insured. Under such circumstances the question arises as to whether or not there is any reasonable basis for distinction or discrimination in deducting the surrender charge under said options (b) and (c), and not under clause (a).

It is true that in the case of New York Life Insurance Company v. Blaylock, 144 Miss. 541, 110 So. 432, the Court held that inasmuch as the contract there involved was susceptible of the construction that the surrender charge was to be deducted only in the event of a physical surrender of the policy, and that since such a construction was favorable to the insured, it would be adopted. However, it was conceded in the opinion in that case that the Court had been unable to find any decision of the question of whether a surrender charge could be deducted only when there was such a surrender of the policy, and that counsel had cited none. The fact remains that the Court dealt with the policy contract there involved as being ambiguous in its terms, and of doubtful meaning. No table of values as related to the several options upon default in the payment of premiums after the third year is set forth in the reported case, coupled with any clause quoted from the policy, referring to such a table and showing that the benefits under the automatic extended insurance clause were arrived at by deducting a surrender

charge from the reserve in advance, the same as when either of the other options are availed of, as in the case at bar. Assuming that the contract in the Blaylock case was ambiguous, and that the right to make the surrender charge in the absence of a physical surrender of the policy was denied upon the theory that the several clauses relating to the benefits accruing to the insured upon a lapse of the policy were subject to two reasonable constructions, as stated by the Court, it is not then necessary that the case be overruled in order to enforce the contract here under consideration. As authority, moreover, for the proposition that no surrender charge can be made except where there has been a physical surrender of the policy after lapse, the case has not been followed in other jurisdictions. While the Court has already declined to overrule the Blaylock case in the somewhat recent decision rendered in New York Life Insurance Co. v. Boling, 177 Miss. 172, 169 So. 882, 111 A. L. R. 967, involving a policy in substantially the same terms as that now before us, it is to be noted that the Court there based its refusal to enforce the provision for the deduction of the surrender charge ''of not more than one and one-half per cent of the face of the Policy'' on the ground primarily that it violated said section 5171 of the Code of 1930, supra, in that the contract left it ''entirely to the insurer to determine, without agreement with the insured, whether the policy is self-sustaining, and what the acquisition expenses are, and the amount of penalty to be imposed to prevent the policy holder from withdrawing from the company.'' For further illustration of the philosophy on which the decision in the Boling case rests, it will be found that the opinion states:

''The statute not only prohibits unfair discriminations and practices being expressly provided for in the policy, but in addition a fair interpretation of it prohibits any provision so indefinite and uncertain as to allow such discriminations and practices. The provision in question is of the latter character. A fixed per cent. of the

face value of the policy is not to be deducted in ascertaining its cash surrender value, but 'not more than one and one-half per cent.' Within that maximum the insurer is given the right to fix the amount to be deducted.

"It is inconceivable that in carrying out the cash surrender value provision of the policy one policy would require any more labor, clerical or otherwise, than any other policy. Where the policy is not surrendered the cash surrender value constitutes premium and keeps the policy in force a certain length of time, based on the amount of such premium. Under the provision in question the insurer could fix, to a certain extent, the amount of such premium; it could deduct therefrom as a surrender charge any amount from 1½ per cent. of the face of the policy down to nothing. To that extent the cost of the policy to the insured is left entirely in the discretion of the insurer. The insurer could arbitrarily discriminate between policyholders of the same class.''

Thus it will be seen that the Court assumed that the amount of the surrender charge was left for the future determination of the company after the policy has lapsed for non-payment of any premium from the third to the ninth year, inclusive, whereas, in the present case, the record discloses, in connection with the plain provision of the policy hereinbefore quoted at length, that a fixed surrender charge had been deducted in advance from the reserve, and the precise result thereof for each year was stated in the "Table of Guaranteed Loan and Surrender Values'' when the contract was issued, leaving the amount of cash surrender value to which the insured was entitled under option (c), the amount of paid-up insurance under option (b), and the amount of the "temporary'' or extended insurance, which could be purchased by said cash surrender value under option (a), plainly expressed in said table. In other words, under the record in this case, it is clearly shown that the insurer is given neither the right nor the opportunity to determine anything, without the consent of the insured, after the

issuance and delivery of the policy. The rights of the parties are definitely fixed by the contract, and no surrender charge other than that already deducted from the reserve when the policy was issued could have been subsequently made. No discrimination is alleged or shown, nor would the same have been possible in view of the proof that a uniform surrender charge for this and all similar policies was fixed by the Office Committee more than thirty years ago, and uniformly applied to the policies, at the time of issuance, by the deduction thereof from the reserve, and giving the result of such subtraction as cash surrender value in the table, as well as its mathematical equivalent in paid-up and extended insurance, respectively, all of which is plainly expressed in the policy itself, as aforesaid.

On the theory that the insurer was permitted, under the Court's construction of the Boling policy, to determine and fix at a future date after its issuance, or at the time of its lapse, such surrender charge as it might see fit, without the consent of the insured, that case was correctly decided. But such is not the case under the record now before us. That which has been definitely computed according to a prescribed formula set forth in a contract, and the results of such computation plainly stated therein, cannot be said to be left to the future arbitrary determination of one of the contracting parties.

Although a good portion of the testimony was suppressed by the court below upon motion of the appellee as not being responsive to the interrogatories, and while the Chancellor's opinion discloses that he deemed all evidence aliunde the policy contract inadmissable, even though given by expert actuaries as to the meaning of technical terms in the life insurance business, the appellee strenuously urges, in support of her contention that the terms of the contract are not plainly expressed, the testimony of the appellant's actuary to the effect that: "The amount of the surrender charge is fixed by the ruling of the Office Committee . . ., and always has

been invariant, and is, and always has been, applied uniformly and without exception upon each policy of insurance issued by the company since 1907 to 1934, inclusive . . .'' And further that: ''Exactly the same surrender charge for each period of the policy was fixed for all similar contracts, and the amount of the surrender charge deducted has always been and is the amount fixed by the policy contract, and by the ruling of the Office Committee.'' Upon the basis of this testimony it is then argued that it is therefore admitted that the amount of the surrender charge is not expressed in the face of the policy, but can be ascertained by adding together the policy contract and the ruling of the Office Committee made in 1907. I cannot agree that this deduction is the reasonable one. It is immaterial that the amount of the surrender charge was fixed by the Office Committee, provided it was fixed in advance, deducted from the reserve on the policy for each .year during which it was to be charged, and the result of the calculation plainly expressed in terms of cash surrender value, paid-up insurance, and extended insurance, respectively, in the table of values embodied in the contract. For aught that appears the Office Committee may have fixed the amount of premium to be charged and how the reserve was to be computed. The inquiry in each instance under the statute here invoked is always whether or not the rights and obligations of the parties, by whomsoever fixed are plainly expressed. If the surrender charge was the amount fixed by the policy contract, as stated by the witness, then the same would be enforceable although the amount thereof had first been determined by a ruling of the Office Committee.

But it is contended that in view of the decision of this Court in the case of Lamar Life Insurance Company v. Minor, 170 Miss. 223, 154 So. 542, 543, which held that a ''Table of Guaranteed Loan and Surrender Values'' contained mere guaranties that for each of these years the loan and' surrender values will not be less than the

stipulated amounts, the policy now before us is likewise rendered ambiguous for the same reason, and that the surrender charge is therefore not plainly expressed in the contract. In the absence of proof as to the technical meaning of the term "guaranteed cash surrender value," as compared with the term, "cash surrender value" or "cash value," the Court in the Minor case, after conceding that the question was not without difficulty, and commenting upon the ambiguity of the contract in question, again adopted the construction most favorable to the insured, under the well recognized rule requiring such construction, and held that the guaranteed values in the table, were mere minimum values. Later, in the case of Mutual Life Insurance Co. v. Nelson, 184 Miss. 632, 184 So. 636, 637, 186 So. 837, where a "Table of Surrender and Loan Values" was involved, our Court distinguished the case from the Boling case, supra, by setting out in the opinion the "Table of Surrender and Loan Values" in the Nelson policy, and the "Table of Guaranteed Surrender Values" in the Boling policy, and then commented upon the latter table as follows: "It will be observed that this is not a table of fixed values as in the case at bar, but of guaranteed values, which simply means that these values should in no event be less than as stated." And, with particular reference to the Nelson policy then at issue, the Court said:

"Was the surrender charge void under Sec. 5171, Code of 1930?

"In the Boling Case the Court held that a surrender charge to be 'not more than one and one-half per cent., of the face of the Policy' violated this statute for the reason that the amount of the charge was not definitely fixed so that the insurer could vary the charge within the limit fixed and thus discriminate between policy holders. Such is not the case here. The policy does provide for a surrender charge during the first ten years of the life of the policy of 'not more than one and one-half percentum of the face amount of this policy,' but it does not stop

there, but further on it sets forth precisely what the cash value of the policy will be for each year, after the surrender charge has been deducted, thereby definitely fixing both the amount of the surrender charge and the policy's cash value.''

Since the proof in the present case shows without dispute that ''Cash surrender value,'' ''Guaranteed cash surrender value,'' and ''cash value,'' all mean one and the same thing, the conclusion is inescapable that what was above said by the Court in upholding the deduction of the surrender charge under the Nelson policy applies with equal force in the case at bar.

On suggestion of error, the Court again discussed this question in the case of Mutual Life Insurance Co. v. Nelson, 184 Miss. 632, 184 So. 636, 186 So. 837, and, among other things, said: ''Moreover, the agreed statement of the facts recites that the actual cash value of $115.89 for the seventh year, as fixed definitely and finally in the policy had been arrived at, when the policy was written, by taking the reserve for the face amount of the policy at the end of the seventh year, which, at 3% interest and computed according to the American Experience Table of Mortality, would be $123.39, and deducting from this a cash surrender value of $7.50, thereby leaving the said $115.89.'' Thus, it will be seen that what was shown by the agreed statement of facts in the Nelson case is disclosed by the undisputed proof in the case here. In that case the surrender charge of $7.50 was upheld again on this suggestion of error, although said amount was not mentioned in the policy. It merely provided for the deduction of a surrender charge of ''not more than one and one-half per cent., of the face value of the policy,'' as is provided in the contract now before us.

Therefore, if ''Guaranteed cash surrender value'' and 'cash surrender value,'' and ''cash value,'' are synonymous terms, it necessarily follows that the reasoning in the Nelson case is controlling here in favor of the right to deduct the surrender charge in question. An examina-

tion of such well recognized authorities as Joyce on the Law of Insurance, Cooley's Briefs on Insurance (2 Ed.), and Couch's Cyclopedia of Insurance Law, fails to disclose that "guaranteed cash surrender value" has any different legal meaning or significance to that of "cash surrender value" and "cash value" in the law of insurance. No text writer is quoted, nor is there any decision from other jurisdictions cited, showing a distinction, except the case of Carter v. Mutual Benefit Life Ins. Co., 230 Ala. 389, 161 So. 446, supported by no authority on that point other than the Minor case, supra, and which decision is in other respects in accord with the views expressed in this opinion. If we should assume here, contrary to the testimony of the expert actuary, that the above-mentioned terms are not synonymous, and that the "guaranteed cash surrender value" set forth in the table herein for each year are mere minimum values, we would have to presume an intention on the part of the insurer to violate section 5171 of the Code of 1930, supra, instead of an intention to obey the statute, which requires the contract to be plain and specific in its terms. This would be contrary to the rule announced in the following cases, and the authorities therein cited, to the effect that there is always a presumption that everyone conforms his conduct to the requisitions of duty, as prescribed by law, to-wit, Orleans Dredging Co. v. Frazie, 173 Miss. 882, 883, 161 So. 699; Id., 179 Miss. 188, 173 So. 431; Wilkie v. Collins, 48 Miss. 496; Cincinnati N. O. & T. P. R. Co. v. Rankin, 241 U. S. 319, 36 S. Ct. 555, 60 L. Ed. 1022, L. R. A. 1917A, 265; American Ry. Express Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414; and Knox County v. Ninth Nat. Bank, 147 U. S. 91, 13 S. Ct. 267, 37 L. Ed. 93. Moreover, if we should indulge in the presumption that "guaranteed cash surrender value" has a separate and distinct legal significance, as compared with "cash surrender value" and "cash value," and means only minimum value (notwithstanding the proof in this case that each of the terms have a technical meaning

peculiar to life insurance contracts, and mean one and the same thing) as the Court did assume in the case of Lamar Life Ins. Co. v. Minor, 170 Miss. 223, 154 So. 542, as followed by the Court in the case of Mutual Life Ins. Co. v. Nelson, 184 Miss. 632, 184 So. 636, 637, 640, and on suggestion of error as reported in 186 So. 837, when referring to the ''Table of Guaranteed Surrender Values'' in the Boling case, supra, in the absence of such proof as we now have before us, it would be necessary that we hold that all of the provisions hereinbefore quoted at length from the policy contract in the case at bar are mere minimum obligations of the insurer and constitute vague, indefinite and uncertain rights and benefits accruing to the insured, for the reason that all of said contract agreements are set forth under the caption of ''Guaranteed Loan and Surrender .Values;'' and that the amount of the loan value, cash surrender value, paid up insurance, and the number of years and days of temporary or extended insurance expressly stated in dollars, years and days are indefinite and uncertain, as constituting minimum benefits only.

According to Black's Law Dictionary (3 Ed.), guaranty and warranty are derived from the same root, and are in fact etymologically the same word. In Webster's New International Dictionary the noun ''guarantee,'' from which is derived the adjective ''guaranteed,'' is defined as ''An agreement by which a person undertakes to secure another in the possession, enjoyment, or the like, of something.'' If A enters into a contract with B which refers to a specified sum of money claimed by B, and recites, ''the payment of $50.00 of which A has guaranteed,'' it could not be held that A has only fixed the minimum of his liability. A guaranty is a contract that some particular thing shall be done exactly as it is agreed to be done, whether it is to be done by one person or another, and whether there be a prior or principal contractor or not. It is shown by the answer to the interrogatories that in the ''Tables of Guaranteed Loan and

Surrender Values" the word "guaranteed" means that the values are "fixed by contract as definitely as are any of the non-forfeiture agreements shown on page 4 of the policy," which are hereinbefore quoted in extenso. Therefore, the distinction made between the "Table of Surrender and Loan Values" in the Nelson case and the "Table of Guaranteed Loan and Surrender Values" in the Minor and Boling cases, respectively, becomes a distinction without a difference in the light of the proof contained in this record, showing that "guaranteed cash surrender value," "cash surrender value" and "cash value," as used in life insurance policies, all definitely fix the maximum as well as the minimum obligation of the insurer, where there are no dividend additions or dividend deposits to vary the same, and the amounts of which may not, of course, be determined in advance and guaranteed.

The State of Arkansas has a statute substantially the same as section 5171 of our Code of 1930, supra, and in the case of Bene v. New York Life Ins. Co., 191 Ark. 714, 87 S. W. (2d) 979, 980, the Supreme Court of that state had under consideration an insurance policy containing provisions not materially different to those here involved, and wherein the Court, in the course of its opinion, said: "The only question presented for our consideration is: Was the appellee justified in making a surrender charge in this case?" The Court then proceeded to discuss and apply the provision which is substantially the same as the clause (a) herein, where it appears that there had been no physical surrender of the policy, and upheld the deduction of the surrender charge in question, saying: "We have no statute in this state which prohibits the making of the contract here involved, and it is not prohibited by public policy." Our Court followed this decision in the recent case of Golightly v. New York Life Ins. Co. (Miss.), 191 So. 111, 114, involving a policy contract like the one now before us, but made in Arkansas, and held that we must necessarily assume that when the Arkansas Court

used the language above quoted in the Bene case the decision was reached in the light of the pertinent statutes then in force, and that "we are not justified in holding that the Arkansas Court was simply mistaken as to whether that state had a statute that would render invalid the contract there sued on, merely because our Court may have taken a different view of the effect of our own similar statute in relation to such a contract made in this state." Also, that: "Section 7953 of Pope's Digest of the Laws of Arkansas had been in force and effect for some time when the Bene case, supra, was decided; and, notwithstanding this statute, the Court said that the state had no statute prohibiting the contract there involved. Presumably the Court made the statement advisedly in the light of its own knowledge of the state statutes. It was an unequivocal pronouncement of the law of Arkansas in regard to the legality of a surrender charge under the circumstances disclosed in that case, which appeared to have been the same as here."

While the Golightly and Bene cases, supra, involving this same contract made in Arkansas, are not controlling in the construction of the present contract made in Mississippi, even though the statutes of the two states are in all material respects the same, the decisions should be persuasive in view of the fact that practically all of the states have these statutes against discrimination between policy-holders by life insurance companies, and in no other jurisdiction has such a policy as that here involved been held to be violative thereof, either on the ground of discrimination or uncertainty. At least thirty states recognize by statute the right to make a surrender charge, while more than one third of the states require that a provision similar to the one here involved be placed in every life insurance contract, to be enforceable without reference to whether or not there is a physical surrender of the policy in connection with the exercise of options similar to (b) and (c) herein, or the absence of such a surrender in the exercise of option (a), in which latter

instance the protection is automatically continued without affirmative action on the part of the insured; while other states, including our own, have no statutes on the question. In no other jurisdiction has it been held that there must be a physical surrender of the policy before a surrender charge could be made, and such holding of our Court in the Blaylock case was put on the ground that the policy then being construed was ambiguous and susceptible of such a construction. No decision from any other jurisdiction has been called to our attention which holds that a policy is indefinite and uncertain when it designates the cash surrender values as ''guaranteed cash surrender values'' instead of ''cash surrender values'' or ''cash values.'' Our Court so held in the absence of proof that the terms were synonymous, as aforesaid, and for the stated reason that the policies in question were thought to be susceptible of that construction, while admitting that even so the question was not without difficulty. When, under the state of case made by the appellee in the record now before us, we hold that the terms of this policy are not plainly expressed, and that it violates the said statute against discrimination, we will doubtless at the same time prevent our people from obtaining a rating for insurance cost as advantageous as that given by this and other life insurance companies to the citizens of other states, and compel a different classification and distinct type of policies for them, resulting to their own detriment, and consequently in their discrimination.

But the inquiry is suggested by appellee that if the surrender charge is determined in advance of the issuance of the policy and deducted in a fixed amount from the reserve, so as to reflect the amount of cash surrender value, paid-up insurance, and extended insurance stipulated in the table of values set forth in the contract, then why provide therein that the amount of such charge was computed at not more than $1\frac{1}{2}\%$ of the face of the policy? The obvious answer is that a uniform contract to be offered the public throughout the United States is

desirable; that more than eighteen states require such a provision to be inserted, and that the charge is computed and deducted in advance to comply with the laws of those states which also have statutes similar to ours requiring the terms of an insurance policy to be plainly expressed. Insurers cannot leave the amount of such charge to their own future determination without violating section 5171 of our Code, and similar statutes of other states (if the courts of such other states should construe their statutes as have ours), nor can they omit the surrender charge clause from their policies without violating the laws of these states requiring its insertion in the contract.

If it be contended that it is possible under the clause in question for the insurer to subsequently vary the surrender charge in favor of one policy-holder as against another, even though deducted in advance, then the same argument can be urged as to the enforcement of the fixed premium charge, period of grace provided for non-forfeiture and other provisions of the contract. A purpose to discriminate where the rights of the parties are already determined and fixed by contract, and to do so in violation of a positive statute is not to be presumed.

Finally, to summarize it should be said: (1) that in the Blaylock case, supra, the Court did not hold that a surrender charge could be made in no event whatsoever in the absence of a physical surrender of the policy, but only held that it could not be made in that case because the policy was ambiguous and susceptible of the construction that a physical surrender was contemplated or required as a condition precedent to the right to deduct the charge. (2) That in the Boling case, supra, the court was not content to rest its decision on the point that there had not been a physical surrender of the policy, but sought a firmer foundation, as a basis for denying the right to deduct the charge of "not more than 1½%," by emphasizing the requirements of section 5171, of the Code of 1930, to the effect that the contract should be

plainly expressed, and held that this had not been done for the reason that the Court was of the opinion that the policy contemplated that the amount of the surrender charge was to be determined by the insurer at a future date, without agreement with the insured, when the contingency might arise for its application, and without attention being called to, or emphasis being placed upon, the recital contained in that policy that the deductions *had already been made* as provided for therein. (3) That it is definitely shown in the present suit that when the policy was issued and delivered nothing was left for future determination as to the amount of the charge in question. (4) That in the Minor and Nelson cases, supra, the Court erroneously assumed, in the absence of such proof as is now before us, that a "Guaranteed cash surrender values" meant only minimum values. (5) That the Court upheld the deduction of the surrender charge in the Nelson case, fixed within the limitation above mentioned, on the ground that the "cash value" of the policy was definitely and finally fixed in the table of values, as representing the reserve less such surrender charge, and which surrender charge had been deducted in advance as in the case at bar, and the decision rested solely upon an assumed distinction between "cash value" and "guaranteed cash value," etc., and which is now shown not to exist as a matter of law or fact, except under the authority of the Minor case. (6) That the expression "guaranteed" used in connection with any promise or agreement, without words of limitation or condition, should be construed as an absolute obligation to do the specific thing referred to. And (7) that since there is no real difference between the terms employed in the Nelson case, which follows the Minor case, and in the case at bar, to designate the cash value or cash surrender value, that case is decisive of the issue here involved. Wherefore, in my opinion the decree of the court below should be reversed, and the bill of complaint dismissed.

McGowen, J., concurs in this dissent.