SIMPSON v. UNITED GAS PIPE LINE CO.

(In Banc. March 13, 1944.)

[17 So. (2d) 200. No. 35567.]

Harold Cox, of Jackson, for appellant.

H. V. Watkins and Ralph B. Avery, of Jackson, and Sholars & Gunby, of Monroe, La., for appellee.

362

Argued orally by **Harold Cox**, for appellant, and by **Ralph B. Avery**, for appellee.

**Roberds, J.,** delivered the opinion of the court.

Appellant, as complainant in this bill, seeks to recover of appellee, defendant therein, $2,171.36, which is the excess of the market price over the amounts actually paid by appellee to appellant for her 1/16th interest in the output of a gas well located in Hinds County, Mississippi, during the period January 1, 1940, to January 1, 1943. The chancellor sustained a demurrer to, and dismissed, the bill, complainant having declined to further plead.

Appellant contends she is entitled to the market value of the gas during that time. Appellee says it had a contract with appellant fixing the price and it paid her that price. That is the issue.

The bill and exhibits thereto present this situation: On November 12, 1930, appellant was the owner of the forty acres of land on which this gas well is located, except that W. A. Hewitt owned a one-half undivided interest in the mineral rights therein. On that day appellant and Hewitt executed to one Kyle an oil, gas and mineral lease on said forty acres, each reserving a 1/16th interest in such minerals. That lease is not in this record and we

do not know the rights, duties and powers of the parties thereto. However, the bill states, and the demurrer admits, it contained this provision: "The grantor shall be paid ⅛th of the value of such gas, calculated at the rate of the market price at the well." The lease was recorded. Through mesne conveyances (which are not in this record) James A. Alexander, trustee, and J. R. Buford acquired through Kyle, lessee, a 12/16th working interest in the gas rights under said tract. Alexander and Buford procured the gas well in question to be brought in on said land. On July 24, 1934, they entered into what is called a gas purchase contract with the United Gas Public Service Company. This contract obligates the sellers to sell to the purchaser all gas from this well and any future wells found on said lands during the time covered by the contract; to keep the wells in good condition; install tubing and casing and proper equipment and devices to utilize and control the gas and separate it from foreign matter and deliver it to the gathering line of purchaser at a designated point. It obligates the buyer to accept and receive the gas from this and future wells and to install casings and pipes and all equipment necessary for measuring, receiving and transmitting the gas which may be produced, the installations and equipment evidently imposing immediate and considerable expense on both parties. The contract then provides that the buyer shall pay for the gas 4 cents per thousand cubic feet for the first five years, and 4.5 cents per thousand cubic feet for the next five years, and for the succeeding five years the price is to be determined by mutual agreement or arbitration, but not to be less than 5 cents. The contract contains this provision: "Seller shall, when requested by Buyer, furnish Buyer signed division orders upon regular forms of Buyer, directing the payment to the proper parties owning gas rights in the premises from which gas is being taken, of such amounts as may be due for royalties or any other interest in said gas, and shall furnish Buyer transfer orders from time to time as

required upon the regular forms of Buyer. Buyer may, at Buyer's option, pay for seller all royalties which may accrue under the terms of any lease or leases covering the hereinbefore described premises, . . ." and deduct the same from the monthly amounts owing the seller.

On the date of this contract Mrs. Simpson and Mr. Hewitt each owned a 1/16th royalty interest; the Arkansas-Louisiana Pipe Line Company owned a 2/16th overriding interest, and J. R. Buford and James A. Alexander, trustee, owned a 12/16th working interest in the gas rights in said land. On July 26th, 1934, these owners executed a division order to United Gas Public Service Company, in which they certified and guaranteed that they were the legal owners of the gas well in question, "including the royalty interest, and you are authorized to receive gas from said well and pay the owners for their respective interests," setting out the interest as above stated. The division order contains this further proviion: "All of the above interests are to be paid in accordance with and under the terms of that certain Gas Purchase Contract entered into by and between James A. Alexander, Trustee, as Seller, and United Gas Public Service Company, as Buyer, under date of July 24, 1934. In consideration of payment to the above named parties by United Gas Public Service Company of the full amount of all interests for gas taken from the above lease, the undersigned hereby warrant title to all gas delivered to United Gas Public Service Company from said lease, and guarantee to hold said United Gas Public Service Company harmless against any and all claims affecting title to the gas so delivered, and against all costs and expenses which may be incurred by said United Gas Public Service Company in defending the title to said gas."

On September 25, 1937, the United Gas Public Service Company transferred and assigned the Alexander-Buford contract and all rights thereunder to the appellee herein.

The bill further states that for a number of years appellee mailed to her checks for the "monthly settlements

of her interest in said gas, and that she has in each instance cashed the checks of the defendant therefor with the notation thereon that it was in full payment and settlement thereof;'' that she is inexperienced as to the market price of natural gas and she relied upon ''the defendant as a reputable business concern to pay her the actual market price . . .'' and she mistakenly assumed ''that she was being dealt with fairly in each of said monthly settlements of her interest in said gas,'' and that her acceptance of said checks for the prices stipulated in the Alexander-Buford contract was under a mistake of fact.

The bill then states that ''throughout said period of time the quantity of natural gas in the Jackson Field has been on a rapid decline as the consequence of which the market price thereof at the well has correspondingly increased, and complainant charges that the market price of such gas at the well throughout the period of said time was and is 9 cents per m. c. f.''

It is the contention of appellant (1) that the quoted provision in the Kyle lease for payment to her of the market price was a covenant which ran with the land and that appellee is bound thereby, (2) that the division order did not stipulate, or fix, the price, but only described the respective interests of the gas owners, and that, in any event, (3) it is not binding upon appellant because there was no consideration for its execution, and (4) that she is not estopped by receiving and cashing the checks prior to January 1, 1940, she having declined to accept and cash them since that date. Appellee takes issue upon these contentions.

Aside from any other question, this division order establishes and fixes the gas prices to be paid by appellee to appellant. It is a contract between them as to that. It sufficiently identifies and sets out such prices. The Alexander-Buford agreement details the prices to be paid. This division order describes that agreement and says the

gas owners "are to be paid in accordance with and under the terms . . ." of that contract. The gas owners warranted the title to all gas to be delivered the purchaser and obligated themselves to defend the title thereto.

The division order was supported by sufficient consideration. It was a condition of the Alexander-Buford contract that they would furnish to the purchaser of the gas this division order. It is evident the purchaser had to expend considerable money to comply with that contract. It is natural that it would not have done so unless and until the gas owners had agreed to the gas prices stipulated therein. That contract fixed the prices to be paid by the purchaser for the succeeding fifteen years. It took a chance on these prices. The gas owners had a guaranteed price for that period. They got an immediate sale for the gas and the arrangement imposed upon others the expense of saving and marketing the gas, as well as the risk in the fluctuating price. It appears that the market price of gas went up about January, 1940. Suppose it had gone down. Or suppose it yet goes down. Appellee is bound to pay the contract price. The division order is directed to the purchaser of the gas in the Alexander-Buford contract. It was the intention and purpose that such purchaser should rely and act thereon. It is not claimed in the bill that appellant was defrauded, deceived or misled into executing this division order, or that there was a mutual mistake resulting in such execution. The method adopted here appears to be the usual method in such cases, and "the division order is a contract between the carrier, or purchaser, and the parties signing." Thuss on Texas Oil & Gas, p. 174, Sec. 129; 2 Thornton, Oil and Gas, 672, Sec. 377; Texas Co. v. Pettit, 107 Okl. 243, 220 P. 956; Amerada Petroleum Corp. v. Melton, 139 Okl. 119, 281 P. 591; Robbins v. Martin, 18 La. App. 223, 138 So. 132.

Affirmed.