The PINEY WOODS COUNTRY LIFE SCHOOL, Ridgway Management, Inc., D'Lo Royalties, Inc., Thomas L. Spengler, Albert L. Fairley, Jr. and James V. Fairley, Executors of the Estate of Alethe V. Fairley, Individually, and all others similarly situated, Plaintiffs-Appellants,

v.

SHELL OIL COMPANY, Defendant-Appellee.

No. 82–4287.

United States Court of Appeals, Fifth Circuit.

March 8, 1984.

Heidelberg, Woodliff & Franks, Kenneth
I. Franks, George F. Woodliff, III, Watkins,
Ludlam & Stennis, Ernest G. Taylor, Jr.,
Larry Keith Parsons, Barnett, Alagia &

Pyle, L. Arnold Pyle, Jackson, Miss., for plaintiffs-appellants.

Watkins & Eager, William F. Goodman, Jr., Paul H. Stephenson, III, Jackson, Miss., for defendant-appellee.

Before BROWN, WISDOM and JOHNSON, Circuit Judges.

WISDOM, Circuit Judge:

This case concerns the interpretation of royalty clauses in certain Mississippi oil and gas leases. The plaintiffs are the owners of mineral rights in the Thomasville, Piney Woods, and Southwest Piney Woods fields in Rankin County, Mississippi. They leased their rights to defendant Shell Oil Company through various conveyances beginning in the mid-1960s. The cause of this controversy, as in many similar suits across the country, was the unforeseen and unprecedented rise in natural gas prices brought on principally by the actions of the Organization of Petroleum Exporting Countries (OPEC) in the early 1970s. Unfortunately for both the plaintiff lessors and lessee Shell, Shell had already committed the gas for sale under long-term contracts at pre-OPEC prices. Unsurprisingly, the lessors brought this class action to recover royalties that they allege Shell owes and has not paid. The district court found for Shell, except on one relatively minor issue, and certified this appeal so that the questions of liability could be decided before the determination of damages. We affirm in part, reverse in part, and remand.

## I. Facts

The facts of this case are recounted in detail in the district court's opinion. *Piney*

*Woods Country Life School v. Shell Oil Co.,* 1982, S.D.Miss., 539 F.Supp. 957. For our purposes it is enough to say that Shell began leasing activities in Rankin County in the 1960s. Shell used seven different lease forms, with three different royalty provisions.[1] The "Commercial" royalty provision provides for royalty

"... on gas, including casinghead gas or other gaseous substance[s], produced from said land and sold or used, the market value at the well of one-eighth (⅛) of the gas so sold or used, provided that on gas sold at the well the royalty shall be one-eighth (⅛) of the amount realized from such sale[s]. ..."

The "Producers 88–D9803" provision calls for royalty

"... on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas sold or used, provided that on gas sold at the wells royalty shall be one-eighth of the amount realized from such sale. ..."

And the "Producers 88 (9/70)" provision orders the lessee

"... to pay lessor on gas and casinghead gas produced from said land (1) sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value at the mouth of the well, of one-eighth of such gas and casinghead gas. ..."

The Commercial and Producers 88–D9803 leases provide for royalty based on "market value" except when the gas is "sold at the well[s]"; the Producers 88 (9/70) royalty is based on "amount realized" except for gas

1. We adopt the names that the district court used to refer to the various royalty clauses. The "Commercial" provision is found in the "Paid-up Mississippi Rev. 7/17/45" and "Commercial—Form CC–78" lease forms; the "Producers 88–D9803" provision is found in the "Producers 88–D9803 (Revised 10/1/48) with Pooling Provision" and "(Mississippi) Form 0–280 Rev. 3 (8–61) 5M–Producers 88 Rev." lease forms; the "Producers 88 (9/70)" provision is found in the "Producers 88 (9/70)—Paid up with Pooling Provision Mississippi–Alabama–Florida", "Producers 88 (9/70) with Pooling Provision–Mississippi–Alabama–Florida", and "Producers 88 Revised–Alabama–Mississippi (11/56)" lease forms. Brackets in the text indicate variations between the lease forms.

used by the lessee. Shell computed royalties in the same manner under all these provisions, however, and contends that they all have the same legal effect.

The gas from these fields is "sour"—it contains hydrogen sulfide. Before the gas can be put into the mainstream of commerce it must be processed. Rather than attempt to find someone to process the gas, Shell decided to do the processing itself. At its Thomasville plant, Shell treats the sour gas from the wells and recovers "sweet gas"—dry methane—and elemental sulfur.

Shell began efforts to market the gas from these fields in 1970. Shell sought buyers on the intrastate market because it wished to avoid restrictive federal regulations on interstate sales. *See* 15 U.S.C. §§ 717–717z (1982); 42 U.S.C. § 6399 (1976). After extensive negotiations with several potential buyers, Shell contracted with MisCoa,[2] of Yazoo City, Mississippi, to sell up to 46,667 thousand cubic feet (Mcf) a day to MisCoa for 53 cents per Mcf, with an increase to 54.59 cents after 15 million Mcf were delivered, and price escalation of three percent a year thereafter. On May 23, 1972, Shell contracted to sell excess gas to Mississippi Power and Light (MP & L) for 45 cents per Mcf, with escalation of one percent a year. Both contracts appear to have been the best available at the time. Both contracts provide that title to the gas passes in the field, when the gas is still sour. But in fact the buyer does not take control of the gas until it is processed and "redelivered". In the MisCoa contract, the measurements of quality and quantity that determine how much MisCoa pays are not made until the gas is "redelivered", as sweet gas, in Yazoo City. The MP & L contract provides for "redelivery" near the Thomasville plant. Both contracts state that the sale price includes "substantial consideration" for Shell's agreement to gather and process the gas and, in MisCoa's case, to assume the risk of loss during transportation to Yazoo City. Apparently, the parties agreed that title would pass at the wells so that the parties could avoid state regulations on pipelines. But the passage of title at the wells is also relevant to the royalty clauses in Shell's leases. Because the gas is supposedly sold "at the wells", Shell has paid royalties based on the actual revenues received from its sales of sweet gas and sulfur,[3] rather than on market value. Shell deducts from these royalties a substantial portion of the costs of processing the gas.

The lessors filed this class action on December 27, 1974, alleging that Shell computed royalty payments improperly.[4] The case was tried without a jury in November and December 1979. On May 3, 1982, the court issued its findings of fact and conclusions of law. The court found that Shell properly deducted the costs of processing from the royalty payments and properly based royalties for gas sold on the actual revenues realized since title to the gas passed from Shell to MisCoa at the wells. The court also rejected the plaintiffs' claim that Shell breached its duty to market the gas.[5] The court did find that Shell should have paid royalties, based on current market value, for gas *used* in off-lease operations, but rejected the plaintiffs' evidence on market value and asked the plaintiffs to provide further evidence. Without explanation, the court also rejected the plaintiffs' claims for royalties on gas used by Shell at the Thomasville plant.

**2.** MisCoa is a partnership of two Mississippi corporations, Mississippi Chemical Corporation and Coastal Chemical Corporation.

**3.** It is clear, and Shell does not contest, that the royalty for elemental sulfur produced from sour gas is covered by the gas royalty clauses rather than the clauses providing for royalties on "mined" minerals. *Scott Paper Co. v. Taslog, Inc.,* 5 Cir.1981, 638 F.2d 790.

**4.** The plaintiffs also alleged that Shell violated the Sherman Act, 15 U.S.C. §§ 1–2 (1982), by engaging in an illegal restraint of trade in, and monopolization of, the gas and sulfur markets in the Thomasville, Piney Woods, and Southwest Piney Woods fields. The plaintiffs did not go forward with proof on this claim and the district court dismissed it. The plaintiffs do not appeal this decision.

**5.** The plaintiffs do not appeal this ruling.

Upon the plaintiffs' motion the court issued a final judgment on the claims decided, and certified the case for appeal under Federal Rule of Civil Procedure 54(b).

## II. *Jurisdiction*

■ Shell argues that we do not have jurisdiction over this appeal, on the ground that the claims not decided are inseparable from those certified. This is plainly incorrect. The district court's decision effectively disposed of all the issues except the amount of extra royalty owed by Shell. Litigation remains on only one claim, the royalties due on off-lease use of gas by Shell. One fact—the market value of gas— is relevant to several claims, but this does not make the claims inseparable. Alternatively, Shell argues that the district court abused its discretion in certifying the appeal. This contention is meritless. The only thing left for the plaintiffs to do in the district court is to present lengthy evidence on the market value of the small amount of gas Shell used in off-lease operations. The plaintiffs' potential recovery would not justify the expense of this proof. We think that the district court acted wisely and in the interests of "sound judicial administration" in certifying the case at this stage. *See Curtiss-Wright Corp. v. General Electric Co.,* 1980, 446 U.S. 1, 9, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1, 12; *Skinner v. W.T. Grant Co.,* 5 Cir.1981, 642 F.2d 981, 983–84.

Shell also argues that the certification reserves some issues other than the amount of Shell's liability on the off-lease use claim—for example, whether "market value" means "current market value" in the context of sold gas as well as used gas. We understand this appeal to present all the issues except two factual questions: the market value of the gas and the amount of gas for which royalties are due.

## III. *The Meaning of the Royalty Clauses*

The basic issues underlying this case are the meaning of "market value" and "sold at the wells" in a royalty clause and the propriety of deducting processing costs from the lessors' royalties. The royalty clauses prescribe different formulas for the calculation of royalties depending on whether the gas is sold or used, and on whether the sale or use is "at the well". Consideration of these distinctions guides our resolution of all the issues in this case.

In both the Commercial and Producers 88–D9803 royalty clauses, the royalty on gas "sold at the well" is based on the amount realized from sale, while on other gas the royalty is based on "market value at the well."[6] In interpreting similar provisions, courts have struggled with perceived grammatical ambiguities. In *Exxon Corp. v. Middleton,* 1981, Tex., 613 S.W.2d 240, for example, the court held that "off the premises" modified both "sold" and "used" in a lease form similar to the D9803; the court therefore held that "at the wells", which is used in apparent contrast to "off the premises", means "on the [leased] premises" rather than "in the field of production". Because the gas was in fact placed in the buyer's control at the time title passed, *Middleton* did not question that the gas was "sold" at that point. Here, however, the lessors argue that the place where title formally passes is not necessarily the place where gas is "sold" for the purposes of the royalty provisions. Resort to grammatical parsing is less instructive here than is a consideration of the purpose of the gas royalty clause, taken as a whole.

Commentators have suggested several reasons for differentiating between gas "sold at the well" and other gas in determining royalty. One author states that "gas is 'sold at the well' when the gas purchaser bears the expense of connecting his lines to the well". In such a case, the sale price is a proper measure of value. On the other hand, if the lessee pays for transportation, he should be compensated for it; the costs of transport are, therefore, deducted from the sale price to arrive at "value at the well". Note, Henry v. Ballard & Cordell Corp.: *Louisiana Chooses a Point*

---

**6.** By contrast, the Producers 88 (9/70) royalty clause treats all gas sold by lessee the same: royalty is based on "amount realized by lessee, computed at the mouth of the well"; only on gas used by the lessee is royalty based on market value.

in Time in the Market Value Gas Royalty Controversy, 43 La.L.Rev. 1257, 1267 (1983). Similarly, Professor Owen L. Anderson suggests that "market value at the well" is determined by deducting transportation costs from the *value* (not the sale price) at the place of sale. Anderson, *David v. Goliath: Negotiating the "Lessor's 88" and Representing Lessors and Surface Owners in Oil and Gas Lease Plays,* 27 Rocky Mtn. Min.L.Inst. 1029, 1120 (1982).

■ These explanations are helpful, but not complete: in addition to transportation, other actions by the lessee away from the wellhead may affect the value of the gas when sold. In this case MisCoa paid, not for sour gas at Rankin County wells, but for sweet gas delivered to Yazoo City. Transportation and processing both increased the value of the gas to MisCoa. *See* Harmon, *Gas Royalty*—Vela, Middleton, *and* Weatherford, 33 Inst. on Oil & Gas L. & Tax'n 65 (1982). Harmon states,

"The most logical conclusion is that the oil and gas industry understood that the term 'market value' in this gas royalty clause would be something less than the gross proceeds received for the sale of the gas, where the gas was sold and the delivery point was some distance removed from the field in which the wells were located. In such circumstances the royalty on gas would be based on market value—the amount for which the gas could have been sold in the field, less compression, gathering, and treating costs. When the gas was 'sold at the wells', whether the delivery point was on or off the lease, the 'amount realized' from the sale would be the basis of any royalty payment."

*Id.* at 69. For reasons discussed in this opinion we disagree with Harmon's conclusion that "market value" may not exceed actual proceeds. But we do find his discussion instructive on the purpose of the distinction between gas sold at the well and gas sold off the lease. We conclude that the purpose is to distinguish between gas sold in the form in which it emerges from the well, and gas to which value is added by transportation away from the well or by processing after the gas is produced. The royalty compensates the lessor for the value of the gas at the well: that is, the value of the gas after the lessee fulfills its obligation under the lease to produce gas at the surface, but before the lessee adds to the value of this gas by processing or transporting it. When the gas is sold at the well, the parties to the lease accept a good-faith sale price as the measure of value at the well. But when the gas is sold for a price that reflects value added to the gas after production, the sale price will not necessarily reflect the market value of the gas at the well. Accordingly, the lease bases royalty for this gas not on actual proceeds but on market value.

"At the well" therefore describes not only location but quality as well. Market value at the well means market value before processing and transportation, and gas is sold at the well if the price paid is consideration for the gas as produced but not for processing and transportation.

### IV. *Point of Sale*

Based on the foregoing discussion, we conclude that the gas sold by Shell was not "sold at the well", within the meaning of the lease, even though the sale contracts provide that title to the gas passes on or near the leased premises. Under the MisCoa contract, for example, title passes in the field but the sale price is not determined until after the gas is processed and transported to Yazoo City. The sour gas is metered in the fields, but this measurement appears to be of little significance. MisCoa effectively pays only for the amount of sweet gas delivered at Yazoo City, and pays a price commensurate with the value of sweet gas at the time the contract was made. The contract explicitly states that the sale price includes consideration for processing and for Shell's assuming the risk of loss during transportation to Yazoo City.

■ The District Court based its holding that the gas was sold in the fields on the provisions of the Uniform Commercial Code. The UCC applies to sales of natural gas, and therefore governs the sale contract

between Shell and MisCoa. Miss.Code Ann. § 75–2–107(1) (1981). The parties to a sale contract may arrange for passage of title in any manner they choose. *Id.* § 75–2–401(1). Title may pass although the quantity of goods has not yet been determined, *id.* § 75–2–105(4), and the quality not yet brought up to contract specifications, *id.* § 75–2–501(1). There is no need to question that, under the sale contract, title passed in the fields. But the simple passage of title does not control whether the gas was "sold at the well" within the meaning of the leases. In the leases, "at the well" refers to both location and quality: gas is "sold at the well" only if its value has not been increased before sale by transportation or processing. This is plainly not the case here.

■ To interpret the leases otherwise would place the lessors at the mercy of the lessee. The lessors had no say in Shell's choice of where to put the passage of title. Their interests were either irrelevant or adverse to Shell's. Shell and its buyers wanted to avoid state pipeline regulations; but their decision to do so had the effect of placing the "point of sale" on the lease, thereby avoiding Shell's obligation to pay royalties based on market value. The opportunity for manipulation is apparent. Harmon, for example, counsels producers to "attempt to obtain appropriate contract amendments which would move the sales point onto the premises of each lease from which gas delivered under the contract is produced" to avoid payment of market value royalty. 33 Inst. on Oil & Gas L. & Tax'n at 95. We note as well the strange results that may occur if the determination of whether gas is "sold at the well" turns solely on the place where title passes. For example, if gas from several leases is delivered at a single point in the fields some lessors may be entitled to market value

royalty while others receive proceeds royalty; similarly, gas produced from one lease through a directional well drilled on another lease would be sold "off the lease" even if delivered at the wellhead itself. *See* Holliman, *Exxon Corporation v. Middleton: Some Answers But Additional Confusion in the Volatile Area of Market Value Gas Royalty Litigation,* 13 St. Mary's L.J. 1, 47–49 & 48 nn. 185–86. If the place of delivery is controlling, it makes "[t]he happenstance of the point of delivery . . . very significant". Hoffman, *Pooling and Unitization: Current Status and Developments,* 33 Inst. on Oil & Gas L. & Tax'n 245, 265 (1982). We are convinced that Mississippi law does not allow the lessors' rights under an oil and gas lease to turn on such "happenstance", especially when the point of delivery is in the lessee's control.

■ Mississippi law looks beyond the formal passage of title when the interests of persons not party to the contract are at stake. *State ex rel. Patterson v. Pure-Vac Dairy Products Corp.,* 1964, 251 Miss. 472, 170 So.2d 274, *appeal dismissed,* 1965, 382 U.S. 14, 86 S.Ct. 46, 15 L.Ed.2d 9. *Pure-Vac* held that a dairy could not evade state milk regulations by changing its sale contracts to provide that title passed at the dairy's loading docks in Tennessee, since the milk was delivered by the dairy to Mississippi customers who paid only for what they received in Mississippi. The court held that the sale occurred in Mississippi and could therefore be regulated.[7] We agree with Shell that *Pure-Vac* does not require us to hold that title to the gas did not pass in the fields. In *Pure-Vac* the court rejected a sham devised specifically to evade state regulation. Here the district court found no bad faith. We do not hold that the gas sale contract was ineffective to pass title in the fields. But *Pure-Vac* does mean that agreement between a buyer and seller on a

---

**7.** The precise holding of *Pure-Vac* was questioned in *Schwegmann Bros. Giant Super Markets v. Louisiana Milk Comm'n,* 1973, M.D.La., 365 F.Supp. 1144, *aff'd,* 1974, 416 U.S. 922, 94 S.Ct. 1920, 40 L.Ed.2d 279, which held that the Pure-Vac Dairy's sales to Louisiana customers (on terms identical with those made to Missis-

sippi customers) were consummated in Tennessee and could therefore not be regulated by Louisiana. This in no way affects the principle of *Pure-Vac* that the parties to a sale contract may not conclusively extinguish the rights of persons not party to the sale simply by selecting a place for passage of title.

place for title to pass need not be conclusive for the purposes of laws extrinsic to the contract. Similarly, the reference in the lease to "sold at the well" need not be controlled by the point at which title passes in the sale contract. We therefore conclude that the gas was not "sold at the well" within the meaning of the Commercial and Producers 88–D9803 leases.

## V. *The Meaning of Market Value*

Because the gas was not "sold at the well", the royalties under the Commercial and Producers 88–D9803 leases must be computed on the basis of "market value at the well" rather than actual proceeds. The district court reached the issue of what market value means in that it held that Shell owed market value royalty under all the leases for gas *used* in off-lease operations. Shell did not appeal this holding and, perhaps because of the small amount of money involved, did not appeal the district court's further holding that "market value" means value when the gas is delivered rather than when the sale contract is made. The plaintiffs contend that this holding is not before us now. Shell, however, contends that the district court's definition of market value applies only to "used" gas, not to "sold" gas. We see nothing in the district court opinion to suggest this result, and we reject Shell's argument that "market value at the well" has different meanings in different clauses of the same sentence. Shell's argument is enough, however, to put the meaning of market value before us, at least with respect to royalties on gas sold by Shell. The district court certified this appeal to dispose of all of the issues except the amount of damages owed by Shell. We affirm the district court's holding.

The meaning of "market value" has been at the fore of lease litigation ever since the price of gas began to increase at a rate much faster than the price escalation claus-es of existing gas contracts contemplated. As long as the price of gas increased at a rate substantially equivalent to the inflation rates provided in sale contracts, it made little difference whether current market value or actual proceeds formed the basis of royalty payments: the check to the lessor was the same. But when the price of gas began to rise much faster than anticipated, this distinction became of the utmost moment to lessors and lessees.

Until the 1970s the authority was clear that "market value" referred to market value at the time of production and delivery rather than when the applicable sale contract was made. *See, e.g., Wall v. United Gas Public Service Co.,* 1934, 178 La. 908, 913, 152 So. 561, 563; *Foster v. Atlantic Refining Co.,* 5 Cir.1964, 329 F.2d 485, 489–90 (Texas law); *Texas Oil & Gas Corp. v. Vela,* 1968, Tex., 429 S.W.2d 866. This rule has been upheld more recently in, e.g., *Lightcap v. Mobil Oil Co.,* 1977, 221 Kan. 448, 562 P.2d 1, 11, *cert. denied,* 1977, 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156; *Montana Power Co. v. Kravik,* 1978, 179 Mont. 87, 586 P.2d 298, 302; *Exxon Corp. v. Middleton,* 1981, Tex., 613 S.W.2d 240, 244–45. This line of cases, to which we refer as the *Vela* rule, was uncontradicted until very recently. A recent line of cases, however, holds that "market value" is equivalent to the price assigned in the sale contract, at least as long as that contract was made prudently and in good faith. The first case so to hold was *Tara Petroleum Corp. v. Hughey,* 1981, Okla., 630 P.2d 1269. *Tara* has been followed in *Hillard v. Stephens,* 1982, 276 Ark. 545, 637 S.W.2d 581, 583, and *Henry v. Ballard & Cordell Corp.,* 1982, La., 418 So.2d 1334.[8]

The *Vela* rule is based principally on the doctrine that a gas sale contract is only executory until the gas is delivered, *Martin v. Amis,* 1926, Tex.Com.App., 288 S.W. 431, 433, and on the premise that the distinction

---

**8.** In *Scott Paper Co. v. Taslog, Inc.,* 5 Cir.1981, 638 F.2d 790, the appeals court affirmed the lower court's use of sales revenues (less processing costs) as a measure of "market price", but this was because the parties had agreed to this method in a division order. *Id.* at 797; *cf. Simpson v. United Gas Pipe Line Co.,* 1944, 196 Miss. 356, 17 So.2d 200, discussed in the text of this opinion.

made by the lease between market value and amount realized is meaningless under the *Tara* rule. *Tara,* on the other hand, found the *Vela* rule unfair because, when prices are rising, the *Vela* rule requires the lessee to pay the lessor an increasing percentage of the total revenues.

Shell argues that *Simpson v. United Gas Pipe Line Co.,* 1944, 196 Miss. 356, 17 So.2d 200, repudiated the rule that a gas sale contract is an executory contract. According to Shell, *Simpson* held that all the gas on the leased premises is sold when the sale contract is made; market value therefore means market value at the time of the contract; and since Shell's sale contracts were made in good faith they are conclusive evidence of the market value of the gas at that time. This argument rests on a misreading of *Simpson*. *Simpson* held that the plaintiff lessor was entitled only to royalties based on the contract price, because the lessor had signed a division order agreeing to take royalties based on that price. The court held that the lessor benefitted from the division order because the order facilitated a long-term gas contract under which the lessor "got an immediate sale for the gas". *Id.* at 366, 17 So.2d at 202. The court was concerned only with whether the division order was supported by consideration. The reference to "immediate sale" had nothing to do with passage of title but simply meant that the long-term contract made further marketing efforts unnecessary and that royalty would begin to be paid immediately.

We fully agree with the district court's conclusions that a gas sale contract is executory and that the sale is executed only upon production and delivery. Under section 75–2–105 of the Mississippi Code [9] the gas underground is future goods; no particular gas is sold until it is identified—i.e., brought to the surface. The sale contracts are not transfers of an interest in land; accordingly, under section 75–2–107(1),[10] the contracts are contracts to sell and only become effective as sales when the gas is severed from the land. The logic of these provisions is clear. Under the leases, Shell has a *defeasible* interest in the gas underground. The most it could sell Mis-Coa or MP & L is that same defeasible interest: in effect, the right to possession of the gas if it is produced before Shell's lease terminates. The leases may terminate if Shell breaches implied or express covenants or if there is a cessation of production after the expiration of the primary term of the lease.[11] If the leases terminate, Shell would no longer have the power to deliver title to the gas. MisCoa might be able to sue Shell for a breach of *contract to sell,* but it would have no claim to the gas itself or to specific performance of the contract, because all title to the gas would have reverted to the lessors. Shell could not "sell" the gas to MisCoa, because a "sale" consists in the passing of title, *id.* § 75–2–106.

We therefore conclude that the gas was not sold until it was produced. The sale

---

9. "(1) 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Chapter 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2–107) [§ 75–2–107].

"(2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are future goods. A purported present sale of future goods or of any interest therein operates as a contract to sell."

Miss.Code Ann. § 75–2–105 (1981).

10. "(1) A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this chapter if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell."

Miss.Code Ann. § 75–2–107(1) (1981).

11. Forfeiture by the lessee has traditionally been the most common remedy for breaches of the requirements of the lease. See 4 H. Williams, *Oil and Gas Law* § 681 (1981). *But see* Waldman, *The Demise of Automatic Termination,* 54 Okla.B.J. 2767 (1983) (forfeiture disfavored in recent Oklahoma cases).

contract itself provides that title passes when the gas is delivered. Accordingly, the basis of royalty should be "market value at the well" at the time of production and delivery, as the district court held.

We also find the district court's decision supported on other grounds. First, the explicit language of the leases distinguishes between gas sold at the well and gas sold off the lease, and between amount realized and market value. The *Tara* rule eliminates the differences: the lessor receives a royalty based on amount realized no matter where and in what form the gas is sold. To be sure, *Tara* states that the contract price is the market price only if the contract was made prudently and in good faith, and therefore the sale price is market value only in those circumstances. 630 P.2d at 1274. But the same is true of royalty under an "amount realized" clause. If the lessee makes a sale in bad faith, he breaches both his duty to deal in good faith with the lessor and his duty to market, and the lessor will not be bound to the contract price. *See Kretni Development Co. v. Consolidated Oil Corp.,* 10 Cir.1934, 74 F.2d 497, 500. Under *Tara,* therefore, any distinction between "market value" and "amount realized" is illusory.

We also reject the interpretation advanced by Harmon and Lowe that market value may never exceed actual proceeds. These commentators suggest that market value simply means actual proceeds less processing expenses. *See* Harmon, 33 Inst. on Oil & Gas L. & Tax'n at 69; Lowe, *Developments in Nonregulatory Oil and Gas Law,* 32 Inst. on Oil & Gas L. & Tax'n 117, 146–47 (1981). Certainly a lease *may* provide for royalties based on proceeds less processing. But this result may be accomplished clearly and explicitly by stating that royalty is "one eighth of the amount realized from the sale of the gas less processing and transportation expenses", or even more simply, "one eighth of the amount realized by lessee, computed at the well".[12] "Market value" as used in these leases is not equivalent to the formulations just recited, because it applies to royalties not only on gas sold at the well but also to gas *used.* There are no "proceeds" or "amount realized" for such gas. It strains language and credulity to argue that the "market value" of gas produced in 1977 and *not* sold to MisCoa is what the gas would have been sold for under a long-term contract made in 1972 rather than what the gas would be worth if sold on the open market when produced. Although it is conceivable that the single use of the term "market value" might require two different computational formulas when applied to two different types of gas, the more natural reading is that the term has the same meaning for both types of gas.

Moreover, Shell and those from whom it received leases by assignment were or should have been aware that "market value" had been held to mean value at the time of production both in old cases like *Wall* and in new cases like *Foster* and *Vela.* *Foster* was decided in 1964. *Vela* was decided by the Texas Court of Civil Appeals in 1966 and affirmed by the Texas Supreme Court in 1968. From the record it appears that no lease at issue here predates *Foster* and only a few predate *Vela.* Though not binding on Mississippi lessees, these decisions were widely discussed in the industry and should have alerted the lessees to the potential legal effect of the royalty clause. Shell certainly had ample opportunity to change the language if in fact it intended a "proceeds" lease. *Vela,* 429 S.W.2d at 871. It has long been doctrine that mineral leases are construed against the lessee and in favor of the lessor.[13] *Frost v. Gulf Oil*

---

12. The Producers 88 (9/70) royalty provision at issue in this case bases royalties on "one-eighth of the amount realized by lessee, computed at the mouth of the well". Shell and other lessees plainly knew how to draft a proceeds lease.

13. In one oil-producing state (Oklahoma) this doctrine has not been applied in many years, but even in Oklahoma the doctrine has never been overruled. *See* Waldman, *The Demise of Automatic Termination,* 54 Okla.B.J. 2767 (1983). Elsewhere it is still clear that lessees will be held responsible for the leases they procure. This rule is justified even if some lessors have better legal advice and more of a

*Corp.*, 1960, 238 Miss. 775, 786, 119 So.2d 759, 761; 2 W. Summers, *Law of Oil and Gas* § 232 (perm. ed. 1959); 3 H. Williams, *Oil and Gas Law* § 628 (1981); 4 *id.* § 684. But our decision that market value means value rather than proceeds is not simply an instance of interpretation against the lessee.[14] It is rather a holding that, although the royalty clauses might have been less than lucid to laymen, they were quite readily understandable to those in the industry. Shell knew what a "market value" lease was and what a "proceeds" lease was. *See Lightcap v. Mobil Oil Corp.*, 1977, 221 Kan. 448, 457, 562 P.2d 1, 8; *Hillard v. Stephens*, 1982, Ark., 637 S.W.2d 581, 587 (Hickman, J., dissenting). Shell "cannot expect the court to rewrite the lease to [its] satisfaction". *Foster*, 329 F.2d at 490.[15]

■ Shell asserts that "[r]oyalty payments based upon good faith contract prices have always been the custom in Mississippi". Brief for Appellee at 42. The district court did not make a finding to this effect and we doubt its universal truth. In a recent Louisiana case, Shell itself stipulated that market value royalty was determined by current market value. *Shell Oil Co. v. Williams, Inc.*, 1983, La., 428 So.2d 798, 799. Of course, Shell is not bound by that stipulation in this case, but *Williams* does indicate that current market value is not unheard of as a basis for royalty in Shell's own leases, even in a state where the same assertion of "custom" was made, and where "market value" has now been held to mean contract price, *see Henry*, 418 So.2d at 1340–41. This allegation of "custom" is of course self-serving. The payment of royalties is controlled by lessees, and lessors have no ready means of ascertaining current market value .other than to take lessees' word for it. *See* M. Merrill, *Covenants Implied in Oil and Gas Leases* 216 (2d ed. 1940). The formula for determining royalty and the statements issued to lessors may be, as in this case, complex; it is likely that many lessors have never known just what basis lessees were using. For a practice to be legally relevant custom, both parties to the contract must have actual or presumed knowledge of the practice. *Meridian Star v. Kay*, 1951, 211 Miss. 536, 545, 52 So.2d 35, 38. Those not engaged in an industry will not be presumed to know that words which have common meanings outside the industry have a different meaning inside it. *New York Life Ins. Co. v. Nessossis*, 1940, 189 Miss. 414, 425, 196 So. 766, 768. Market value in these leases is most easily understood to mean current value: the lessors cannot be presumed to know that Shell and other producers made a practice of basing their royalty payments on a different criterion. We will not find "custom" binding on lessors from a practice within the control and understanding only of the lessees.

The most important rationale underlying the *Tara* rule is the concern that it is unfair to require the lessee to pay increasing royalties out of a constant stream of revenues. The reasoning is as follows: the lessee has a duty to market the gas; gas is customarily sold in long-term contracts; the lessee is thus forced by his duty to the lessor to enter into a long-term contract but then sees his profits whittled away as the market price of gas rises. *See Tara*, 630 P.2d at 1273. The *Tara* court reasoned further that its rule was not unfair to lessors, because they still receive royalties and are protected

---

role in negotiations today than they did at one time, because lessees still have greater expertise in and knowledge of the industry and the law surrounding it, still provide the lease forms, and still have bargaining advantages that limit the ability of lessor a to take an active role in the making of leases. *Id.* at 2773.

14. If the price of gas declines, a market value royalty clause would benefit a lessee who has contracted to sell gas at a favorable price. *See, e.g.*, Note, 43 La.L.Rev. at 1266 n. 49.

15. For the same reason we reject the argument, accepted in *Henry*, 418 So.2d at 1338, that the "ultimate objective of the royalty provisions of a lease is to fix the division between the lessor and lessee of the economic benefits anticipated from the development of the minerals." If the purpose were to fix royalty at a permanent percentage of lessees' profits, the lessee could certainly devise language to say so. We hold to the contrary that the market value clause serves in part to protect the lessor from bad bargains by the lessee.

by the lessee's obligation to make a reasonable sale contract. *Id.* at 1274.

We appreciate that a lessee may find itself economically disadvantaged when its royalty obligations increase while its sale revenues remain constant. But this is no more than the risk assumed by every business venturer who undertakes the role of middleman. In this case it appears that Shell chose to market its gas to MisCoa at an initial price higher than any previously negotiated in the United States, but with a low annual escalation rate. Shell might instead have accepted a lower initial price but reserved the opportunity to redetermine the price at later intervals. Transcript at 1658–72. The district court held that Shell's decision was not a breach of the lease-created covenant to market, since the choice of the MisCoa contract was a prudent and reasonable one. But prudence does not relieve Shell of its obligations under the lease. To say that the gas contract was what a "prudent operator" would have negotiated under the circumstances begs the question. The question is whether the operator should be saved from loss of profits simply because it acted prudently and the world economy acted adversely. If Congress or the Mississippi legislature wishes, it may establish a relief fund or create tax credits to assist the unfortunate lessees. It is not the function of the courts, construing and enforcing contracts under state law, to intervene on behalf of producers experienced in the petroleum industry, and thereby deprive lessors of their legitimate contractual expectations. "Stripped of all its trimmings [the "fairness" argument] is simply: We cannot comply. This is no answer .... The fact that the ascertainment of future market price may be troublesome or that the royalty provisions are improvident and result in a financial loss to [the lessee] 'is not a web of the Court's weaving.'" *Foster,* 329 F.2d at 490 (footnote omitted).

We conclude that the *Tara* rule is unfair to lessors. A landowner may decide to accept a royalty based on a smaller fractional share of market value, rather than to hold out for a larger share of proceeds, because of an expectation that the market value will rise. If the courts then intervene and declare that "market value" is the same as "proceeds", this expectation is destroyed. Moreover, the lessor has no means with which to persuade the lessee to renegotiate the lease to reflect the changed legal rule. This is illustrated by the following hypothetical. A landowner is offered leases by two producers. The first offers a ⅛ market value royalty; the second offers a ⅙ proceeds royalty. The landowner decides to lease to the first operator, because he thinks the market value of gas will rise enough to compensate for the lower fractional share. This is a business risk: if the price does not rise enough, the lessor loses money. If, however, the price rises as the lessor thought, the lessor has won his bet, just as the lessee has lost his gamble that the price would not rise; and the lessor ought to profit. But if the *Tara* rule intervenes, it takes away the lessor's legitimate expectation of market value royalties without any compensation at all. The lessor would be frozen into ⅛ proceeds royalties on a long-term low-price sales contract made by his lessee.

By contrast, under the *Vela* rule, which we adopt, the lessor's royalties increase according to the provisions of the lease. At some point the lessee may find continued operation so unprofitable that it is more economical to cease production. At this point the lessor has a strong incentive to renegotiate the lease, because a cessation of production will mean the end of all royalties until another lessee can be found, and the present lessee has a comparative advantage over others in that it has the necessary facilities already in place. The lessee's buyers will have an incentive to renegotiate the sale contracts rather than seek new and more expensive sources of gas.[16]

---

16. In these renegotiations, for example, the lessor might agree to take ⅙ of actual proceeds instead of ⅛ of market value; or the buyer might consent to pay a price nearer to market price, or to compensate the lessee for royalties. *See* Harmon, 33 Inst. on Oil & Gas L. & Tax'n

In short, the rule proposed by Shell would deprive the lessors both of their expected market value royalties and of any opportunity to recover some of these royalties through renegotiation of the lease. By enforcing the clear terms of the market value lease, we preserve those expectations and provide opportunities and incentives for the parties to make new contracts more nearly reflecting current economic conditions.

Accordingly, we affirm the district court's holding that market value means current market value at the time of production.

## VI. *Proof of Market Value*

Max Powell, the plaintiffs' expert witness on the issue of market value, based his estimates of market value on the average of the top three prices for gas sold in seven counties that he had previously selected as a relevant market area. This technique is the same one that Powell used, and that the court approved without contest, in *Butler v. Exxon Corp.*, 1977, Tex.Civ.App., 559 S.W.2d 410. It is similar to the method used in *Exxon v. Middleton*, 1981, Tex., 613 S.W.2d 240. The district court, however, found Powell's testimony unpersuasive. Shell challenged Powell's data on the ground that sales of sweet gas are not comparable with sales of sour gas. The district court rejected this argument, noting that the processing costs, which reflect the price of converting the sour gas to sweet gas, are deducted from royalty. But the court found Powell's data noncomparable because of "[t]he unprecedented volume, deliverability and reserves of production" in the Thomasville-Piney Woods fields. The court devised its own formula:

"Once the relevant market area is defined and comparable sales are identified, the Court concludes that computa-

tion of market value should be made by the division of net sales receipts derived from sales of comparable gas (after necessary adjustments for variances in Btu content and compression changes) by the total volume sold."

539 F.Supp. at 987. The court made no findings on market value and directed the parties to consult the court for directions on further proof. *Id.*

■■■■■ Although the district court did not certify this issue for appeal, the plaintiffs now ask us to order the district court to use Powell's method for determining market value on remand. This we decline to do. Market value is a question of fact, and it is up to the factfinder to determine the probative strength of relevant evidence. The plaintiffs contend that Powell's evidence was the only evidence on the issue, but the Shell-MisCoa contract, while not *conclusive* evidence of market value, was also plainly *relevant* to the issue. *See* E. Brown, *The Law of Oil and Gas Leases* § 6.09, at 6–66 to 6–67 (1983). The district court found that the sales used by Powell were made under conditions different enough to weaken their persuasiveness. The court was within its discretion to seek evidence of sales it considered more nearly "comparable".

■■■ A number of courts have struggled with the question of how to prove market value. *See, e.g., Exxon v. Middleton*, 1981, Tex., 613 S.W.2d 240; *Montana Power Co. v. Kravik*, 1978, 179 Mont. 87, 586 P.2d 298; *Weymouth v. Colorado Interstate Gas Co.*, 5 Cir.1966, 367 F.2d 84. The only general rule that emerges from these cases is that the method of proof varies with the facts of each particular case. In determining market value at the well, the point is to determine the price a reasonable buyer would

---

at 95; Anderson, 27 Rocky Mtn.Min.L.Inst. at 1112–13.

We note that the Shell-MisCoa sale contract provides that Shell has the right to abandon operation of the Thomasville plant and its obligation to sell gas to MisCoa, upon six months' notice, if Shell becomes "unable to conduct the operation of such Plant and wells on a continuingly profitable basis". During the six-month

notice period, Shell and MisCoa "agree to negotiate in good faith in an effort to reach acceptable supplemental arrangements whereby [Shell], or an assignee of [Shell], will continue beyond such six (6) months' period to operate the Thomasville Plant and wells serving such Plant and to deliver gas to Buyer". Exhibit P–18(a), § 19.4, at 42–43.

have paid for the gas at the well when produced. Comparable sales of gas at other wells may be used to do this. Another method is to use sales of processed gas and deduct processing costs. Yet another relevant measure is the one proposed by Shell, the actual sale price of the gas less costs. "This is the least desirable method of determining market price", *Montana Power,* 586 P.2d at 303–04, but its persuasiveness is a matter for the factfinder.

Completely comparable sales are not likely to be found.[17] Sales that have some different characteristics must be considered. "[O]bjections against uncomparable sales, irrelevancies and unreliable hearsay [go] to the weight which the [factfinder] ... should attach to the expert's opinion, and the protection to the other side as has always been true under our system [is] cross examination." *Weymouth,* 367 F.2d at 91. Especially when the court is factfinder, the court as well as counsel may question the expert opinions. But it should not dismiss fairly comparable sales out of hand because of certain incomparable qualities. The district court stated that there was a "lack of relevant evidence addressing comparability", 539 F.Supp. at 987. The evidence produced by plaintiffs may, in the opinion of the court, have been insufficient, but it was plainly *relevant.* The plaintiffs produced evidence suggesting that, while some factors differentiate the Thomasville-Piney Woods wells from the wells upon which Powell based his data, those factors (abundance and availability) would *increase,* not decrease, the value of the plaintiffs' gas. It was, of course, for the court as factfinder to accord this testimony such weight as it saw fit, and to seek better information as well. We therefore reject the plaintiffs' request that on remand we mandate the use of the Powell formula as the exclusive measure of market value. But if, on remand, the search for better measures of market value at the well proves unsuccessful or inordinately burdensome, we think it the duty of the trier of fact to decide the question as best it can on the basis of the evidence that is presented. The plaintiffs must meet their burden of proof and produce sufficient relevant evidence to support their contentions. Having provided such evidence they should not be faced with the impossible task of establishing market value with absolute certainty or perfection. *See* 3 H. Williams, *Oil and Gas Law* § 650.3 (1981). It is Shell's responsibility to rebut the plaintiffs' evidence and provide evidence of its own to support its

---

17. Courts have identified a wide range of factors that may affect the price of natural gas. *See, e.g., Hugoton Prod. Co. v. United States,* 1963, 315 F.2d 868, 161 Ct.Cl. 274, listing the following relevant factors:

"(a) The volume available for sale. Generally the greater the volume or reserves, the greater the price the seller could command.

"(b) The location of the leases or acreage involved, whether in a solid block or scattered, and their proximity to prospective buyers' pipelines.

"(c) Quality of the gas as to freedom from hydrogen sulphide in excess of 1 grain per 100 cubic feet.

"(d) Delivery point.

"(e) Heating value of the gas.

"(f) Deliverability of the wells. The larger the volume that could be delivered from a reserve, the greater the price the seller could command.

"(g) Delivery or rock pressure. The higher the pressure, the less compression for transportation is required."

315 F.2d at 894–95. *Exxon v. Middleton* also contains a thorough discussion of the factors affecting market value, including the following:

"Market value may be calculated by using comparable sales. Comparable sales of gas are those comparable in time, quality, quantity, and availability of marketing outlets. *Vela, supra.*

"Sales comparable in time occur under contracts executed contemporaneously with the sale of the gas in question. Sales comparable in quality are those of similar physical properties such as sweet, sour, or casinghead gas. Quality also involves the legal characteristics of the gas; that is, whether it is sold in a regulated or unregulated market, or in one particular category of a regulated market. Sales comparable in quantity are those of similar volumes to the gas in question. To be comparable, the sales must be made from an area with marketing outlets similar to the gas in question. Gas from fields with outlets to interstate markets only, for instance, would not be comparable to gas from a field with outlets only to the intrastate market."

613 S.W.2d at 246–47 (footnote omitted).

contentions. The decision is for the finder of fact, but the decision is made by balancing, not by erecting an insuperable barrier to relevant evidence.

### VII. *Processing Costs*

■ The gas from these fields is extremely sour. It is an expensive proposition to convert the raw gas into marketable sweet gas and elemental sulfur and to transport the gas and sulfur to the buyers. Shell has passed on to the royalty owners a proportion of these costs, as determined by complex formulas that compensate Shell for expenses and capital investment. The plaintiffs argue that this is improper, since a royalty interest is "not chargeable with any of the costs of discovery and production", *Mounger v. Pittman,* 1959, 235 Miss. 85, 86–87, 108 So.2d 565, 566. They cite authority for the proposition that "production" includes the lessee's marketing efforts and that therefore any costs necessary to make gas marketable are to be borne exclusively by the lessee. *See West v. Alpar Resources, Inc.,* 1980, N.D., 298 N.W.2d 484; *Sterling v. Marathon Oil Co.,* 1978, 223 Kan. 686, 576 P.2d 635; *Schupbach v. Continental Oil Co.,* 1964, 193 Kan. 401, 394 P.2d 1; *Gilmore v. Superior Oil Co.,* 1964, 192 Kan. 388, 388 P.2d 602; *California Co. v. Udall,* D.C.Cir.1961, 296 F.2d 384; 3 E. Kuntz, *Law of Oil and Gas,* § 40.5 (1967); M. Merrill, *Covenants Implied in Oil and Gas Leases* 212–18 (2d ed. 1940). They argue that leases are construed against the lessee and that, in the absence of specific language authorizing deductions, no deductions may be permitted.

Shell responds, and the district court held, that production ends when the gas is extracted from the earth. Expenses incurred after production may be charged against royalty computed "at the well". 3 H. Williams, *Oil and Gas Law* § 645 (1981). Accordingly, the costs of processing and transportation may be deducted.

We agree with Shell that the specification in the leases that royalty is computed "at the well" controls. In Part III of this opinion, we discussed the purposes of distinctions between "amount realized" and "market value at the well". We concluded that "at the well" refers not only to the place of sale but also to the condition of the gas when sold. "At the well" means that the gas has not been increased in value by processing or transportation. It has this meaning in conjunction with "value" or "amount realized" as well as with "sold". The lessors under these leases are therefore entitled to royalty based on the value or price of unprocessed, untransported gas. *Freeland v. Sun Oil Co.,* 5 Cir.1960, 277 F.2d 154, 157. On royalties "at the well", therefore, the lessors may be charged with processing costs, by which we mean all expenses, subsequent to production, relating to the processing, transportation, and marketing of gas and sulfur.

We emphasize, however, that processing costs are chargeable only because, under these leases, the royalties are based on value or price at the well. Processing costs may be deducted only from valuations or proceeds that reflect the value added by processing. Thus, processing costs may not be deducted from royalties for gas "sold at the well", because the price of such gas is based on its value before processing.

■ The function of processing costs in determining royalties based on "market value at the well" is to adjust for imperfect comparisons. As we discussed in Part VI of this opinion, the best means of determining the market value at the well of the plaintiffs' gas would be to examine comparable sales of *sour gas* at other wells in the area. Apparently there were no such sales. The next-best method is to examine sales of sweet gas and sulfur, to determine the market value of the products resulting from processing at the Thomasville plant. Processing costs may then be deducted as an indirect means of determining what a buyer would have paid for the sour gas at the wellhead.

■ Under the Producers 88 (9/70) royalty provision, "amount realized by lessee, computed at the mouth of the well", is the basis of royalty for *all* gas sold, not merely

that sold at the well (as in the other leases at issue here). Under this clause, processing expenses are deducted from the amount realized from the sales of sweet gas and sulfur to arrive at the royalty basis. *See Holbein v. Austral Oil Co.,* 5 Cir.1980, 609 F.2d 206 (per curiam); *Kretni Development Co. v. Consolidated Oil Corp.,* 10 Cir.1934, 74 F.2d 497.

The plaintiffs argue that Shell is entitled to deduct at most costs of sulfur production, but not to make deductions against residue gas. We see no basis for this distinction. The lessors are entitled to gas royalty at the well. This means royalty based on the value or price of the sour gas before it is separated into marketable constituents. The value or sale price of the residue sweet gas reflects Shell's processing costs just as surely as does the value or price of the sulfur.

We agree with the plaintiffs that the processing costs, under both the "market value" and "amount realized" provisions, must be reasonable. The plaintiffs charge that Shell's formulas allocate more of the costs to royalty interests than is justified. According to the plaintiffs, the district court failed to consider this issue. We are unable to determine whether it did. The district court's opinion makes no specific finding whether the formulas are reasonable, but the final judgment states that the court denied the claim for "improper and *excessive* charges made against ... royalty interests". Record at 2019 (emphasis added). The record would support a finding of reasonableness, but since this case is to be remanded we leave the issue open for further consideration by the district court.

### VIII. *Plant Fuel*

Shell uses gas from the plaintiffs' leases for operations on other leases ("off-lease fuel") and at the Thomasville plant ("plant fuel"). The district court upheld the plaintiffs' claim for royalty on off-lease fuel; but without explanation it denied the claim for royalty on plant fuel. Record at 2020. Shell does not dispute that plant fuel is "gas used off the lease" within the mean-

ing of all the royalty clauses. Its response is rather than any royalties paid for use of plant fuel can simply be charged back to the lessors as processing costs. "The futility of such an exercise," says Shell, "is readily apparent. It would clearly be a wash." Brief for Appellee at 25.

It seems to us that the validity of Shell's argument depends on the accounting method used. The plaintiffs strenuously, although confusingly, insist that it will not be a "wash". They point out that, under the plant-lease split employed by Shell, only a portion of the costs of processing are borne by royalty owners. Furthermore, the working interests bear the costs on ⅞ of the gas produced. Another possibility is that the total additional royalty payments might equal the total additional charges to royalty, but that individual royalty owners might be entitled to more or less, depending on the particular well from which Shell takes the plant fuel in a given month. Finally, processing costs are not per se chargeable to market value royalty. They must be *reasonable* costs, and the market value of sour gas may be more or less in a given time period than the value of the finished products less processing expenses.

Even if Shell is right that it owes no extra royalties for plant fuel, we do not think that this would justify its practice. The lessors are entitled to have their royalty determined according to the provisions of the lease, not according to an ad hoc method adopted without their consent. The leases plainly call for market value royalty on gas used off the lease and the royalty should be determined on that basis. We therefore hold that plant fuel is gas used off the lease and the lessors are entitled to market value royalty on that gas. Shell may, however, treat the royalty payments as processing costs to be divided, as any other processing costs, among the various working and royalty interests.

### IX. *Attorney Fees and Prejudgment Interest*

The plaintiffs requested attorney fees and costs on the theory that Shell

exhibited bad faith. They also requested prejudgment interest, under Mississippi law, on the theory that Shell acted in bad faith and was guilty of conversion. *See Home Insurance Co. v. Olmstead,* 1978, Miss., 355 So.2d 310; *Phillips Distributors, Inc. v. Texaco, Inc.,* 1966, Miss., 190 So.2d 840; *Ingram Day Lumber Co. v. Robertson,* 1922, 129 Miss. 365, 92 So. 289. The district court denied both requests. We affirm that holding. The plaintiffs made no showing that Shell acted in bad faith either before or during this litigation. Nor is there any basis for holding Shell guilty of conversion. "Conversion requires an intent to exercise dominion or control over property inconsistent with the true owner's rights." *Masonite Corp. v. Williamson,* 1981, Miss., 404 So.2d 565, 567. Shell neither intended to exercise nor exercised any control inconsistent with the lessors' rights. It had every right to take the gas; it simply failed to pay royalties according to the proper measure. This is breach of contract but it is not conversion.

Our affirmance on this issue is without prejudice to the right of the attorneys representing the plaintiff class to seek fees for their efforts on behalf of the class at the conclusion of this litigation.

### X. *Conclusion*

We hold that "at the well" refers to gas in its natural state, before the gas has been processed or transported from the well. The gas sold by Shell under the MisCoa and MP & L contracts was therefore not "sold at the well" within the meaning of the leases. Accordingly, under some of the leases the plaintiffs are entitled to royalty based on market value for that gas. We hold that in the leases "market value" means the market value of the gas at the time the gas is produced and delivered. Because the leases call for royalty based on market value or price "at the well", royalty is based on the value or price of the gas before it is processed or transported. To determine the correct basis for royalty, processing and transportation costs may be deducted from values or prices established for processed and transported gas. We also hold that the plaintiffs are entitled to royalty on plant fuel, but Shell may include these royalties as processing costs. On remand, the district court may, in its discretion, seek more accurate measures of market value than the evidence of comparable sales already produced by the plaintiffs. If those efforts prove unsuccessful or unduly expensive, the court must determine market value based on the evidence already submitted. The evidence already produced by the plaintiffs on market value is clearly relevant, and Shell has the burden of rebutting that evidence and producing more accurate evidence of market value.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for a determination of damages in accordance with this opinion.